UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

Karen M. Hall,                                         Case No.: 14-55400
                                                               Chapter 13
                 Debtor.                           Hon. Walter Shapero
_____/

Karen M. Hall,

       Plaintiff,

v.                                                                Adversary Proceeding
                                                               Case No.: 14-05254

CitiMortgage, Inc. and All Assigns,

       Defendant.
_____/

## **OPINION REGARDING VALUE OF REAL PROPERTY**

**I.**       **INTRODUCTION**

Debtor, Karen Hall, filed this adversary complaint to strip the lien of creditor, CitiMortgage, Inc. Debtor has two mortgages on her primary residence, located at 14000 Talbot, Oak Park, Michigan 48237 ("the Property"). The first, held by Nationstar Mortgage, LLC, had a balance of $64,705.49, as of the September 30, 2014 petition date. The second, held by CitiMortgage, Inc., had a balance of $37,086.76. CitiMortgage opposes the lien strip.

The Court conducted a trial on May 26, 2015. Debtor testified and also provided the testimony of an appraiser, Martin Kaltenbach, who valued the Property at $52,000. CitiMortgage provided the testimony of its appraiser, Sheri Mykolaitis, who valued the Property at $70,000. Because the Court concludes that the value of the Property is less than $64,705.49, CitiMortgage's

second mortgage is wholly unsecured. Judgment will therefore enter in favor of Debtor.

## II. EVIDENCE

### A. Debtor's Testimony

Debtor has lived on the Property since 1966. She obtained the second mortgage approximately 10 years ago and used the money to update her kitchen and help her family. She stated that, other than the kitchen, the Property has never really been otherwise updated. She describes its condition as "deplorable" and states that other homes in the neighborhood are much nicer. She testified that the basement walls are cracked and she thinks there may be black mold present. She further testified that the Property has the original electrical system, a warped floor in the living room, is heated by an outdated gravity furnace, and approximately 80% of the shingles on the roof are gone. Debtor testified that she obtained a quote several years ago for replacement of the furnace, asbestos abatement, and installation of central air for a cost of approximately $12,000-14,000.

Debtor valued the Property at $54,000 on her schedules. She stated that her son helped her come up with that figure based on the current condition of the Property.

### B. Martin Kaltenbach's Testimony

Debtor's appraiser, Martin Kaltenbach, is a certified residential real estate appraiser, having been an appraiser since 1993 and having appraised over 5,000 homes. He describes the Property as a 3 bedroom, 1 bath bungalow, built in 1948. It is located in the Berkley School District. It has an unfinished basement and 1,023 square feet of living space. It has a detached 2 car garage, a porch and a patio. Kaltenbach testified that he considered the Property to be in below average condition

due to deferred maintenance issues. He stated that the roof needs to be replaced and there is water damage to the living room ceiling. He also indicated that there were signs of water in the basement. He stated that the gravity furnace is inefficient and expensive to replace due to asbestos wrapping around the pipes and the need for new duct work. Further, the aluminum siding on the house is obsolete and chalking. With respect to the garage, he noted that the roof has a hole in it and the garage paint is peeling.

Kaltenbach's appraisal, dated February 3, 2015, valued the Property at $52,000. His appraisal was based on an inspection of the Property and a Multiple Listing Service ("MLS") search for recent comparable sales. Kaltenbach's appraisal contains four comparable homes. In selecting his comparable homes, Kaltenbach stated that he tried to find homes in similar condition to the Property. He was unable to find many direct comparables in the vicinity because many of the surrounding homes were brick ranches in better condition than the Property.

1. **Kaltenbach's First Comparable Home**

Kaltenbach's first comparable home is a few houses away from the Property. It is an aluminum sided bungalow built the same year as the Property. It sold in September 2014 for $70,500. Kaltenbach stated that this was his best comparable because of its location, style, and the fact that it too had not been updated. Kaltenbach made a $12,000 downward adjustment because he viewed the home to be in better condition than the Property. He also made a $4,500 downward adjustment because the home had central air and forced air heating. The basement was partially finished, resulting in a $1,800 downward adjustment. Finally, he made an upward adjustment of $500 because the home only had a one car garage and an upward adjustment of $500 because the

home did not have a porch. The resulting net adjustments of $17,300 resulted in an adjusted sale price of $53,200.

### 2. Kaltenbach's Second and Third Comparable Homes

Kaltenbach's second and third comparable homes were .85 and .97 miles away from the Property and were in a different, and less desirable, school district than the Property. They did not have basements, however, they did have forced air heating. They sold for $37,500 and $38,000, respectively, in November of 2014 and April of 2014. Kaltenbach stated that he selected these comparable homes primarily because they were in below average condition. Kaltenbach stated that these homes were in the Oak Park School District which is ranked 538 of 602 districts in Michigan according to the website schooldigger.com, whereas the Berkley School District is ranked 104. Kaltenbach made upward adjustments of $12,000 to each home to account for the different school district. Following adjustments, the second comparable home had an adjusted sale price of $50,000 and the third comparable home had an adjusted sale price of $54,300.

### 3. Kaltenbach's Fourth Comparable Home

Kaltenbach's fourth comparable was a bank owned property that sold for $50,000 in November of 2013. It is an aluminum sided bungalow with an unfinished basement. It is .18 miles from the Property and in the same school district as the Property. Kaltenbach rated the condition of this home as below average. His net adjustments were only $1,100, resulting in an adjusted sale price of $48,900.

### C. Sheri Mykolaitis's Testimony

CitiMortgage's appraiser, Sheri Mykolaitis, is also a certified residential appraiser, having begun her training in 2001, and becoming fully licensed in 2003. She performs approximately 350 appraisals per year. She owns her own appraisal company and primarily performs appraisals for banks, mortgage companies, and individuals. She performed her appraisal in January of 2015 and determined the value of the Property to be $70,000 as of the petition date.

With respect to the Property, she testified that the roof on both the house and the garage needed to be replaced, the living room had some water damage to the ceiling, and there was a broken window. Mykolaitis stated that she did not consider the gravity furnace to be a major problem because it was in working order. She also did not take into consideration the condition of the garage in rating the home because, in her opinion, a garage (apparently regardless of its condition) does not add significant value to a home.

She rated the condition of the property as C4, which according to the Fannie Mae appraisal guidelines is defined as:

> The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.
>
> *Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.*

(Def.'s Ex. B at 37)

Mykolaitis stated that she did not give the Property a lower C5 rating because that rating reflects a home that is not in livable condition.

Mykolaitis stated that in completing her appraisal, she only considered homes in the Berkley School District because there is a significant difference in value between homes located there and homes in the Oak Park School District.

### 1. Mykolaitis's First Comparable Home

This home, located .11 miles from the Property, sold for $97,000 in July 2014. Mykolaitis made a $15,000 downward adjustment because the home was in better condition than the Property. She made a $3,000 downward adjustment because the home had central air and a forced air furnace, a $3,000 upward adjustment because the home did not have a garage and a $500 upward adjustment because the home did not have a porch. The adjusted sales price was $83,000. Mykolaitis stated that this home, along with her second comparable, was the best in determining the Property's value.

### 2. Mykolaitis's Second Comparable Home

This home, located .18 miles from the Property, sold in July 2014 for $73,000. It is slightly larger than the Property, has a finished basement, was built 20 years after the Property, and has forced air heating. It does not have a garage. Mykolaitis made net adjustments of $3,500, resulting in an adjusted sale price of $69,500.

### 3. Mykolaitis's Third Comparable Home

This home, located .28 miles from the Property, sold in March 2014 for $77,000. Mykolaitis stated that it was in better condition than the subject property and had 2 bathrooms. However, it did not have a basement. Net adjustments amounted to $10,000, resulting in an adjusted sale price of $67,000.

### 4. Mykolaitis's Fourth Comparable Home

This home, located .26 miles from the Property, sold for $90,000 in April 2014. Mykolaitis testified that this home was in better condition than the Property, was newer, was fenced, had a partially finished basement, central air and forced air heating. Net adjustments of $21,000 resulted in an adjusted sale price of $69,000.

5.   **Mykolaitis's Fifth Comparable Home**

This home, located .23 miles from the Property, sold for $87,000 in April 2014. Mykolaitis stated that it was in better condition than the Property, had a partially finished basement, had central air and forced air heating, and was fenced. However, it did not have a patio and only had a one car garage. Net adjustments of $19,500 resulted in an adjusted sale price of $67,500.

6.   **Mykolaitis's Sixth Comparable Home**

This home, located .28 miles from the Property, sold for $72,000 in June 2014. It had the least amount of adjustments, resulting in an adjusted sale price of $70,500. Adjustments included $500 for an additional half bath, $1,000 because it was slightly larger than the Property, $1,500 because it had forced air heating and $500 because it was fenced. Upward adjustments of $1,500 because it only had a one car garage and $500 because it did not have a patio were noted.

7.   **Mykolaitis's Seventh and Eighth Comparable Homes**

These homes had not sold as of the effective date of the appraisal, however Mykolaitis stated that she included them because most of her clients require that current listings be included in the appraisals.

Comparable #7, located .09 miles from the Property, was listed for $112,000 and sold for $110,000. After net adjustments of $19,500, the adjusted sale price was $92,500.

Comparable #8 is the same as Debtor's comparable #1. It was listed for $74,000 and sold for $70,500. Net adjustments by Mykolaitis resulted in an adjusted sale price of $69,500.

**III.    ANALYSIS**

In a Chapter 13 case, § 1322(b) prevents modification of the rights of the holder of a claim "secured only by a security interest in real property that is the debtor's primary residence." 11 U.S.C. § 1322(b)(2). An exception to the anti-modification provision of § 1322(b) applies if there is more than one mortgage on the property and the property is worth less than the amount owing on the first mortgage. In such case, the second mortgage can be "stripped" from the property. *See Lane v. Western Interstate Bancorp* (*In re Lane*), 280 F.3d 663, 664 (6th Cir. 2002) ("Where a creditor holds a second mortgage on a homestead valued at less than the debtor's secured obligation to a first mortgagee, . . . the holder of the second mortgage has only an 'unsecured claim[.]'").

As noted, the amount owing on the first mortgage is $64,705.49.  Debtor has the burden of proving, by a preponderance of the evidence, that the Property was worth less than that amount on the date the petition was filed. *McKinney v. JP Morgan Chase Bank* (*In re McKinney*), 501 B.R. 338, 339-40 (Bankr. E.D. Mich. 2013); *Briseno v. Mut. Fed. Sav. & Loan Assoc.* (*In re Briseno*), 496 B.R. 509, 515 (Bankr. N.D. Ill. 2013).

Both appraisers used the sales comparison approach. "Under the sales comparison approach the appraiser conducts a search of a similar real estate market to the subject property in order to find properties in similar situations to determine the value of the property in question." *In re Whitney Lane Holdings, LLC*, No. 08-72076-478, 2009 WL 2045700, at *8 (Bankr. E.D.N.Y. July 6, 2009). "However, as each real property is unique the appraiser will make adjustments to account for the

differences between the subject property and the comparable properties in order to determine the appropriate value of the subject property." *Id*. "Valuation is inherently subjective and depends on the judgment of the appraiser as to what constitutes a 'comparable' property." *Hall v. Brendan Fin*. (*In re Hall*), 495 B.R. 393, 396 (Bankr. N.D. Ill. 2013).[1] It is important to note that "[t]he valuation of property is an inexact science." *In re American HomePatient, Inc*. 298 B.R. 152, 173 (Bankr. M.D. Tenn. 2003). Moreover,

> Because the valuation process often involves the analysis of conflicting appraisal testimony, a court must necessarily assign weight to the opinion testimony received based on its view of the qualifications and credibility of the parties' expert witnesses. *See In re Coates*, 180 B.R. 110, 112 (Bankr. D.S.C. 1995) ("The valuation process is not an exact science, and the court must allocate varying

---

[1] There are guidelines to consider when selecting comparable homes:

> Comparable sales should have similar physical and legal characteristics when compared to the subject property. These characteristics include, but are not limited to, site, room count, gross living area, style, and condition. This does not mean that the comparable must be identical to the subject property, but it should be competitive and appeal to the same market participants that would also consider purchasing the subject property. Comparables that are significantly different from the subject property may be acceptable; however, the appraiser must describe the differences, consider these factors in the market value, and provide an explanation justifying the use of the comparable(s).

> Comparable sales from within the same neighborhood (including subdivision or project) as the subject property should be used when possible. Sale activity from within the neighborhood is the best indicator of value for properties in that neighborhood as sales prices of comparable properties from the same location should reflect the same positive and negative location characteristics.

FannieMae Selling Guide, https://www.fanniemae.com/content/guide/selling/b4/1.3/08.html

-9-

> degrees of weight depending upon the court's opinion of the credibility of . . . [the appraisal] evidence."). As noted by the Bankruptcy Court for the Southern District of Ohio in *In re Smith,* 267 B.R. 568, 572-573 (Bankr. S.D. Ohio 2001), when "weighing conflicting appraisal testimony, courts generally evaluate a number of factors, including: . . . the appraiser's education, training, experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented." *Id.* (internal citations omitted). A bankruptcy court is not bound to accept the values contained in the parties' appraisals; rather, it may form its own opinion considering the appraisals and expert testimony. *Id*. at 573; *see, e.g., In re Abruzzo,* 249 B.R. 78, 86 (Bankr. E.D. Pa. 2000) ("I am left to some extent with the proverbial battle of the appraisers. Finding merit to both their positions, the only conclusion I can reach is to find some value in between.").

*Id*. at 173-74.

Here, the Court is faced with two competing appraisals - one valuing the Property at $52,000 and one valuing the Property at $70,000. Only one of the comparables, located just down the street from the Property, was used by both appraisers. Kaltenbach stated that he would not have used any of Mykolaitis's other comparables because all of the homes she used were far superior to the Property in that they had either been extensively updated or were brick ranches.

Mykolaitis stated that she would not have used the other comparables used by Kaltenbach because his comparables #2 and #3 were too far from the Property, located in a different school district, and did not have basements. Further, his comparable #4 sold more than one year before his appraisal and was a bank owned property.

There is some merit in both appraisers' assessments of the other appraiser's comparables. That said, however, the home in question here is located at 14000 Talbot in Oak Park, located in the Berkley School District. As noted, each of their appraisals utilized a number of comparables, but

-10-

only one was used by both of them. That is the property at 13750 Talbot in Oak Park, also in the Berkley School District and quite close to the subject home. It seems appropriate to the Court that each expert's treatment of, and reference to, that particular comparable property (and their differences with reference to such) as part of their overall value conclusions should carry the more substantial weight in this Court's conclusion. Mykolaitis's appraisal included this home as an active listing, priced at $74,500. Mykolaitis made a $2,500 downward adjustment for the estimated sale price as well as an additional downward net adjustment of $2,500, resulting in an adjusted sale price of $69,500. The home actually sold for $70,500, which reduces her adjusted sale price to $68,000. Mykolaitis considered this home to be in the same condition as the Property and therefore did not make any adjustments for condition. It appears that Mykolaitis did not give much weight to this comparable because it had not sold as of the effective date of her appraisal. However, it did sell one week after the effective date and before she conducted her appraisal. Further, it appears to be most similar to the Property

Kaltenbach's adjusted sale price for this home is $53,200. He made a $12,000 downward adjustment for the condition of the home, which he considered to be average, compared to the Property, which he considered below average. The listing ticket describes the home as:

> North Oak Park fixer-upper bungalow w/ Berkley Schools in excellent neighborhood. New 2 story garage with tons of storage space. 2 full baths. Eat in kitchen with appliances included. Hardwood floors, cove ceilings, central air, vinyl windows, jetted tub, ceiling fan, security system with fenced yard.

(Def.'s Ex. D at 1)

While some adjustment may be appropriate for this property being in better overall condition, a $12,000 adjustment seems excessive for property described as a "fixer-upper." Reducing the condition adjustment to $6,000 would result in an adjusted sale price of $59,200. Likewise,

-11-

reducing Mykolaitis's adjusted sale price by $6,000 to account for condition would result in an adjusted sale price of $62,000. This comports with the Court's conclusion that the value of the Property as of the petition date was somewhere in the range of $60,000, the Court arriving at this value after considering all of the evidence and testimony, especially that regarding the gravity furnace, the roof, and the garage.

Mykolaitis stated that she did not consider the gravity furnace to be a major problem because it is in working order. Given its nature and age (and consequent potential repair and replacement issues), the Court believes that such a furnace would likely be somewhat of a deterrent or a negative to the average home-buyer considering a home in the price range of the Property. With respect to the condition of the Property's garage (it has a hole in the roof and needs to be repainted), Mykolaitis stated that, in general, she did not feel that a garage added much value to a home and that it could be torn down and thus not change the value of the home. However, in her appraisal she made a $3,000 adjustment to homes that did not have a garage. Certainly, having a garage in need of major repair might have an impact on the value of the home.

**CONCLUSION**

Because the Court has concluded that the value of the Property is less than the amount owing on the first mortgage, CitiMortgage has an unsecured claim which can be stripped under §1322(b)(2).

Plaintiff shall present an appropriate order.

**Signed on July 29, 2015**

-12-

```
                                        /s/ Walter Shapero
                                Walter Shapero
                                United States Bankruptcy Judge
```